IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS ROGGE,<br><br>         Petitioner,<br><br>  vs.<br><br>DARRELL ADAMS, Warden,<br><br>         Respondent. | No. C 03-1159 JSW (PR)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

## INTRODUCTION

Petitioner Dennis Rogge, a prisoner of the state of California, has filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging the constitutional validity of his state convictions. Respondent has filed an answer to the petition and a memorandum of points and authorities and exhibits in support thereof. Petitioner has filed a traverse. For the reasons discussed below, the Court will deny the petition.

## BACKGROUND

A jury found Petitioner guilty of two counts of residential burglary, one count of petty theft with a prior conviction, and one count of concealing stolen property. (Cal. Pen. Code §§ 459, 460(a), 666, 496.) The jury found Petitioner not guilty of one count of petty theft with a prior conviction. At a separate court trial, the court found Petitioner had suffered ten qualifying prior convictions under California's Three Strikes Law. On November 19, 1999 the court sentenced Petitioner to a term of sixty-five years to life in state prison, comprised of a determinate term of fifteen years for the concealing stolen property and petty theft counts, followed by two consecutive terms of twenty-five years to life for the two burglaries, and consecutive five year terms for each of the strike allegations.

Petitioner appealed his conviction to the California Court of Appeal, and also filed a state habeas corpus petition in the court of appeal raising an ineffective assistance of counsel claim. On December 19, 2001, the California Court of Appeal affirmed the judgment in a reasoned

opinion, and summarily denied the habeas corpus petition. Petitioner sought review from the California Supreme Court in both cases. On March 20, 2002, the California Supreme Court denied review.

Petitioner filed the present petition on March 18, 2003. He raises the following grounds for relief: (1) the trial court deprived Petitioner of his right to effective assistance of counsel and to due process when it refused to appoint an expert witness, (2) the trial court deprived Petitioner of the right to confront and cross-examine witnesses when it would not admit testimony about multiple sclerosis; (3) the trial court deprived Petitioner of a fair trial when it refused to give a requested mistake of fact instruction; and (4) the evidence is insufficient to support the conviction for concealing stolen property.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). *Lockyer v. Andrade*, 538 U. S. 63, 70-73 (2003). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412 (2000); *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d

1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has repeatedly explained that AEDPA--which embodies deep-seated principles of comity, finality, and federalism -- establishes a highly deferential standard for reviewing state court determinations. *See id.* at 436.

Under § 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412. .

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000); *Packer v. Hill*, 291 F.3d 569, 578-79 (9th Cir. 2002), *rev'd on other grounds*, 537 U.S. 3 (2002). The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002).

A federal habeas court may also grant the writ if it concludes that the state court's

3

adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Rice v. Collins,* 126 S. Ct. 969, 975 (2006). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state court of appeal, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). Under this standard, if the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the *Brecht* analysis. *Id.* at 787.

## STATEMENT OF FACTS

The following statement of facts is taken verbatim from the opinion of the California Court of Appeal, with the exception that "Rogge" will be substituted for the state court's use of "Appellant.":

> Rogge was charged with crimes in connection with two burglaries, committed a year apart, of Janice Phebus's house. Phebus lived in Palo Alto and collected coins and paper currency. At the time of trial in this case, she was 57 years old and had been diagnosed with multiple sclerosis for 15 years. Beginning in the fall of 1996, Phebus hired Bill Cox to do some work on her property. Rogge was a day laborer who sometimes assisted Cox.
>
> Phebus gave Cox a key to her house, although he never worked in the house, so he could use the bathroom and telephone. Before January of 1997, Cox lost the key while rototilling Phebus's yard. Phebus and Cox looked for the key but were unable to find it, so Phebus gave him a new one.
>
> Rogge was in Phebus's house on a few occasions. He moved some boxes from the back porch into the house, he came into the living room to discuss the stock market with Phebus, and used the phone in the kitchen several times. Phebus made a point of watching him when he was inside the house. Phebus had various housekeepers who usually came once a week. Phebus was always home

4

when they were there and stayed close to them.

On January 19, 1997, Cox was scheduled to do some work in Phebus's garage. Phebus left the house at 7:30 a.m. to go to a coin show she had mentioned to Cox and Rogge. She locked the house when she left. Rogge's father-in-law, Raymond Meek, lived next door to Phebus. Around 10:00 a.m., Meek saw Rogge around Phebus's house. Meek and his wife were preparing to leave and Rogge came inside Meek's house briefly. When he departed he left his jacket behind. Meek assumed Rogge was doing some work for Phebus and Cox, and Meek's wife placed Rogge's jacket on Phebus's porch.

When Phebus returned home at 5:00 p.m., she unlocked her front door and brought the jacket inside because she thought it belonged to Cox. As soon as she entered her house, she saw that things were out of place. There were matches that did not belong to her, dolls and a statue were knocked over, a book of coins that had been in a desk was lying on the hallway floor, guns that had been stored in containers had been moved and taken out of their boxes. She initially thought that several stacks of coin books and some handguns were missing, but later found those items elsewhere in her house. Eventually she determined that a $20 gold piece which she had purchased for $500 and some jewelry was missing.

The next day, Phebus showed Cox the jacket. He tried it on and it was clearly too big for him. They looked in the pocket and found the key to her house and a ticket stub to a monster truck show. Cox and Rogge had attended the truck show.

Rogge was arrested. He told the police that he had entered Phebus's house with a key, got a Coke from the refrigerator, and left. The next Tuesday, following his release from jail, Rogge came to Phebus's door and apologized for causing trouble. Phebus did not confront Rogge about her property because he smelled of alcohol. At the preliminary hearing in this matter, Phebus testified Rogge told her he had come into the house to get a Coke and he used the key he found in the back yard. She said Rogge knew Cox had lost a key.

A Palo Alto police officer testified that shortly after this incident Meek described seeing Rogge the morning in question walking down the street with his hands in his pockets, and did not mention that he saw Rogge with a drink in his hands. The officer also observed a refrigerator stocked with drinks for workers in Phebus's garage. Meek's wife testified Rogge was walking with his hands in his pockets and she did not see anything in his hands.

Phebus changed the locks on her house and did not give Cox a new key. Cox's project with Phebus was finished, and he went to work for her neighbors.

A year later, on January 21, 1998, Phebus left her house at about 4:00 p.m. to pick up some food. She locked her house and returned about twenty minutes later. Around the same time, Rogge finished working at a neighboring house. When Phebus returned, she heard what sounded like the back door closing. Her house had been ransacked. A $1 silver certificate that was stored in a protective plastic cover was on the floor of the entryway right inside the front door.

Phebus left the house and called the police. When she returned with them, she

5

    saw that her guns had been moved around and coins were strewn about. A hutch was open an in disarray. Before the first burglary, Phebus had kept a $500 bill in it and had retrieved the bill from there, taken it outside, and shown it to Rogge. After the first burglary, Phebus kept that bill in her safe. A living room window had been broken, leaving a hole big enough for a person and broken glass inside the house. A panel of the back porch door had buckled in a manner that suggested someone had tried to kick the door open from the outside. The gate in the fence outside the bedroom was open and the hinges were broken. Shoe impressions of an Airwalk logo were on the fence and back French doors.

    Around 6:00 p.m., while the police were still at Phebus's house, Joseph Sciascia, a neighbor, saw Rogge walking down the street. Rogge squatted down in front of a car and then Sciascia saw a flame, which he thought looked like it came from a cigarette lighter, two or three times. He saw Rogge get up, flip his hand and then leave. Sciascia went over to where he had seen Rogge crouched and saw a crumpled $2 bill. Within five minutes, he saw Rogge sitting in a police car. On the other side of a hedge from where the bill had been, Sciascia and the police officer found a plastic container that had held one of Sciascia's coins which Phebus stored for him.

    Rogge was detained wearing Airwalk shoes that had the same sole pattern and were approximately the same size as the sole prints at Phebus's house and could have made the prints on the French doors. There were glass fragments in and on Rogge's shoe that could have come from the broken window. Rogge's fingerprint was on the plastic container for the $1 silver certificate found on the floor of the house just inside the front door.

Ans. Ex. 3, *People v. Rogge*, H020838 at 2-4 (Cal. Ct. App. Dec. 19, 2001) ("Opinion").

## DISCUSSION

**I.**    **Improper Exclusion of Expert Testimony**

    A.    Background

    Petitioner argues that the trial court violated his rights to present a defense and to confront the witnesses against him by refusing to appoint an expert witness to explain the possible effects of multiple sclerosis on memory. He also contends that defense counsel was ineffective for failing to hire or renew the request for such an expert. These three claims are discussed together.

    During pretrial motions, defense counsel asked that he be allowed to read from medical texts about the effects of multiple sclerosis on memory and cognitive ability. The prosecutor argued that reading from treatises can only be done in certain circumstances during cross-examination. Counsel, who was retained, then asked the court to appoint a physician to testify

about multiple sclerosis because Petitioner did not have sufficient funds to retain such an expert. He argued this evidence was highly probative to the issue of Phebus's credibility and crucial to the defense. Counsel stated that he did not intend to have the physician examine Phebus, but indicated that what he was "really interested in is to have a physician testify as to what multiple sclerosis is about, what are the symptoms, how long the disease lasts, which is basically forever." RT 30.

The trial court ruled that defense counsel could ask Phebus about her condition and that she could testify about her own perception of the illness, including whether it affected her ability to recall and perceive, but that counsel could not read from a medical text. The court denied the motion for appointment of an expert because it was untimely -- counsel had been involved in the case since 1998 -- and the court held that general testimony about multiple sclerosis would not be relevant unless the doctor actually examined Phebus, which would require a continuance. RT 31, 35. The court also found that the probative value of such evidence was marginal, that it was substantially outweighed by the consumption of time and undue prejudice to the prosecution, and that it was likely to confuse the issues for the jury and possibly mislead them. RT 35. The court noted that counsel could renew his request as the trial progressed, but counsel did not do so.

As relayed in the appellate opinion, at trial,

> Phebus testified that her multiple sclerosis was a recurring/remitting type, meaning that she has outbreaks sometimes two years apart. She has weakness in her legs, walks with a cane and has bladder dysfunction. She testified her disease does not cause any thinking, hearing or memory problems for her. She described her vision as very good although at the time of these offenses she suffered from a condition that caused pain in her eye. In January 1998 she was taking medication for a broken wrist.
>
> Rogge presented evidence that portrayed Phebus as eccentric and confused. He called a witness who testified that Phebus once stopped her car suddenly and made a U-turn almost hitting a truck and that once she consulted with a landscape gardener and, when he came to her with some plans a week later, she seemed not to know why he was there and acted like he was bothering her. This witness told a defense investigator he thought Phebus might have been Sciascia's girlfriend but they had broken up and she refused to give his coins back. He also said Phebus paid Cox to have sex. Another witness testified that on January 10, 1997, Phebus showed the witness and Rogge some bills encased in plastic and

7

///

    that Rogge had touched the case. These bills were identical to the one introduced at trial. The defense also presented evidence that Phebus's house was cluttered and messy.

Opinion at 5.

On rebuttal, Phebus testified that she went to the landscape gardener's house to discuss landscaping with him, but his yard was very ordinary and he had been drinking, so she left without making plans and did not contact him further. RT 625-28. She denied having a near accident, being Sciascia's girlfriend, or paying Cox for sex. RT 630-31.

On appeal, the California Court of Appeal found that upon a proper showing of necessity, the trial court must provide expert defense services to an indigent defendant, even if he has retained counsel. However, "'the burden is on the defendant to make a showing of need before the court is required to appoint an expert.'" Opinion at 7 (quoting *People v. Worthy*, 109 Cal. App. 3d 514, 521 (1980)). The court of appeal rejected Petitioner's claims as follows:

> Here, the trial court properly denied Rogge's motion because the material he wanted to present through the physician was not reasonably necessary for his defense. The considerable liberality usually allowed such a request when made at an early stage of the proceedings is unnecessary here. Counsel was not investigating, but actually had textbooks with the information he wished to present to the jury. When he was told he would not be allowed to read from the texts, his request for the expert witness was made simply to obtain an alternative means of presenting the same information to the jury that he had described to the court earlier. Thus, the trial court knew in ruling on counsel's motion for appointment of an expert the material to which the expert would testify. The trial court was in an excellent position to assess the relevance and admissibility of the proposed testimony. Having determined Rogge had not shown reasonable necessity for the services and that the material would be inadmissible under Evidence Code section 352, the court properly declined to appoint an expert witness to testify. The court could evaluate the probative value of this evidence as weighed against possible prejudice and consumption of time having had a full discussion with counsel of the material. Furthermore, defense counsel declined to renew his request following Phebus's testimony which included her description of the effects of multiple sclerosis on her. The trial court did not abuse its discretion in declining to appoint an expert witness. [Fn. Thus, Rogge did not receive ineffective assistance of counsel based on counsel's presentation of this request.]
>
> Rogge claims that denying his request for appointment of an expert violated his right to confrontation and infringed his due process right to present a defense.

> He argues "Evidence relating to the ability to perceive and recall of any witness is relevant to her credibility and should be admitted. The court erred in finding this evidence inadmissible and thus denied Rogge his right to present a defense and to cross examine a primary witness." [The state] argues "even if the court erred, Rogge's theories of constitutional error are not meritorious. His claim, without regard to any particular constitutional theory, fails because the denial of his motion amounted to nothing more tha[n] an exclusion of certain evidence under state law." We agree. Because we hold that the trial court did not err in denying Rogge's motion to appoint an expert witness, we find no constitutional error. In any event, Rogge fully cross-examined Phebus at both the preliminary examination and at trial. He argues that the expert testimony was necessary to present a defense to the 1997 burglary because he hoped to show Phebus was confused and forgetful about where her property was, and speculates this was a result of her multiple sclerosis. He points to evidence that the movement of property within the house was all that Phebus pointed out to the police on the day she made her report. Some property she later reported missing she subsequently found in other locations in her house. This testimony may have resulted in Rogge's acquittal on the petty theft charge accompanying the burglary charge for that date despite Rogge's admission that he entered the home using the key he found in the backyard. However, expert testimony concerning the effects of multiple sclerosis in general would have only a tangential relationship to the jury's assessment of Phebus's credibility and thus was properly excluded.

Opinion at 8-9.

B. <u>Applicable Federal Law</u>

The Due Process Clause does not guarantee the right to introduce all relevant evidence. *See Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). A defendant does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise inadmissible under standard rules of evidence. *See id.* The exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 43 (quoting *Patterson v. New York*, 432 U.S. 197, 201-02 (1977)) (internal quotations omitted). One of the fundamental rules that may be violated by the erroneous exclusion of defense evidence is the Sixth Amendment right to present a defense. *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and *Washington v. Texas*, 388 U.S. 14, 18-19 (1967)). However, while this right is well established, it does not preclude discretionary limitations on presentations of defense witnesses by the trial court. *See Arredondo v. Ortiz*, 365 F.3d 778, 783-84 (9th Cir. 2004)

(exclusion of presentation of defense witness who has invoked the Fifth Amendment).

When deciding whether the exclusion of evidence violates the due process right to a fair trial or the Sixth Amendment right to present a defense, the court balances the following five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Chia v. Cambra*, 360 F.3d 997, 1004-06 (9th Cir. 2004) (state court erred by excluding reliable, material evidence of petitioner's innocence). The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based. *See id.* at 1006; *see e.g., Alcala v. Woodford*, 334 F.3d 862, 877-78 (9th Cir. 2003) (exclusion of expert testimony that had "remarkable impeachment value" with respect to key prosecution witness, in case resting largely on circumstantial evidence, violated defendant's constitutional rights); *Pool v. Dowdle*, 834 F.2d 777, 780 (9th Cir. 1987) (no violation to exclude expert testimony where testimony was cumulative and not major part of defense).

Under the Confrontation Clause, the accused has the right to cross-examine the witnesses against him. *See Davis v. Alaska,* 415 U.S. 308, 315 (1974). Again, however, the Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant. *See Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986). To determine whether a criminal defendant's Sixth Amendment right of confrontation has been violated by the exclusion of evidence on cross-examination, a court must inquire whether: "(1) the evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." *See United States v. Beardslee,* 197 F.3d 378, 383 (9th Cir.1999) (citations omitted).

In order to obtain habeas relief on the basis of an evidentiary error, a petitioner must

show that the error was one of constitutional dimension and that it was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). He would have to show that the error had a substantial and injurious effect or influence in determining the jury's verdict. *See id.* at 623. In order to prevail on a Sixth Amendment ineffectiveness of counsel claim a petitioner must establish that (1) counsel's performance was deficient, that is, that it fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and (2) he was prejudiced by counsel's deficient performance, that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

        C.    <u>Analysis</u>

The court of appeal upheld the trial court's ruling that expert testimony about multiple sclerosis was not reasonably necessary to present a defense, would be unduly time-consuming, and could confuse and possibly mislead the jury. This was not an unreasonable determination in light of the fact that counsel did not intend to have the expert examine Phebus and therefore the testimony would be general in nature, not about Phebus's particular limitations, if any. Moreover, Phebus did testify in detail about how multiple sclerosis affected her personality, and defense counsel was able to challenge her testimony through vigorous cross-examination. Counsel asked Phebus about the effects of her disease, RT 224-28, and also elicited differences between her trial testimony and her preliminary hearing testimony, RT 151-55, 163-66, 212-15, 253-57. Counsel relied on that evidence to challenge Phebus's memory during closing argument. RT 770-76. In addition, three witnesses testified as to specific examples of Phebus's alleged confusion or impaired thinking process. Under these circumstances, Petitioner was not deprived of his right to present a defense or to cross-examine the witnesses against him.

Even if an error arose, there was no substantial and injurious effect on the jury. *Brecht*, 507 U.S. at 637. The physical evidence linking Petitioner to the offenses -- which did not depend

11

upon Phebus's credibility -- was strong. Petitioner's fingerprint was found on a silver certificate inside Phebus's house; shoe prints on Phebus's door were similar to those of the shoes Petitioner was wearing when he was arrested; there were glass fragments in Petitioner's shoes that could have come from the broken window at Phebus's house; he was seen discarding items stolen from Phebus's house shortly after the burglary; and Phebus's lost house key was found in Petitioner's pocket. Petitioner never attempted to argue that any of these pieces of physical evidence against him resulted from Phebus's poor memory or cognition.

Finally, Petitioner was not denied effective assistance of counsel. Counsel had the opportunity to cross-examine Phebus and to argue that she was confused, irrespective of whether that confusion stemmed from her multiple sclerosis or other causes. Counsel's decision not to renew the request for an expert witness during trial could have been strategic as well, as he could have run the risk of portraying Petitioner as a person who took advantage of a physically and mentally debilitated older woman. Moreover, there is no reasonable probability that the jury would have reached a different verdict but for counsel's failure to present an expert witness -- as already discussed, the physical evidence against Petitioner was compelling and cannot be attributed to Phebus's mental state.

For these reasons, the state court's rejection of Petitioner's claims was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the trial record. Accordingly, these claims for habeas corpus relief are DENIED.

**II.     Instructional Error**

    A.     Background

Petitioner contends he was denied a fair trial because the trial court refused to give an instruction on mistake of fact.

Defense counsel asked the trial court to instruct the jury pursuant to CALJIC No. 4.35, which reads:

> An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime. Thus a person is not guilty of a crime if he commits an act or omits to act under an actual [and reasonable] belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful.

RT 652; CT 227.

The request was based on counsel's argument that there was evidence from which the jury could reasonably have found that Petitioner honestly but mistakenly believed that he had permission to enter Phebus's house in order to get a Coke from the refrigerator. The trial court found there was no factual basis to justify the instruction. RT 654.

On appeal, the court of appeal upheld the trial court's decision, finding as follows:

> Rogge argues there was evidence from which the jury could reasonably have found that [he] honestly but mistakenly believed that he had permission to enter Phebus's residence to obtain a Coke from the refrigerator. Rogge told Phebus after his arrest that he entered her home with the key he found in the backyard. Further evidence relevant to this issue was that Phebus gave Cox a key and permission to enter to use the phone or bathroom, Rogge had been in the house on other occasions, there were sodas for workers in a refrigerator in the garage, and Cox and Rogge may have both been working there that day. Although Rogge did not testify, we are mindful that his testimony was not essential if other testimony existed from which his state of mind could reasonably be inferred. [Citation omitted.] However, this evidence does not support a reasonable inference that Rogge believed, mistakenly or otherwise, that he had permission to enter Phebus's house to get a Coke. Cox himself had no such permission. The sodas in the garage would indicate retrieval of a soda from within the house was unauthorized. Rogge had not come by the key in a way which would indicate he had permission to use it. Rogge himself apologized for using the key and did not indicate he believed he was authorized to do so.
>
> Because the evidence was insufficient to support a reasonable inference that Rogge mistakenly believed he could enter Phebus's house to get a soda, the trial court did not err in declining to give the requested instructions.

Opinion at 10-11.

### B. Applicable Federal Law

It is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence). However, the defendant is not entitled to have jury instructions raised in his

13

precise terms where the given instructions adequately embody the defense theory, *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979), *cert. denied*, 445 U.S. 966 (1980), nor is he entitled to an instruction embodying the defense theory if the evidence does not support it, *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995), *cert. denied*, 517 U.S. 1158 (1996). An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory. *Tsinnijinnie*, 601 F.2d at 1040. This allows a determination of whether what was given was so prejudicial as to infect the entire trial and so deny due process. *See id.*

    C.    <u>Analysis</u>

The California Court of Appeal concluded that there was not sufficient evidence to support a defense based on a mistake of fact, and therefore the trial court was not required to give the requested instruction. A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner has not done so here. Accordingly, the Court must conclude that the state court's determination was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Moreover, even if the trial evidence may have supported a mistake of fact defense, the trial court's instructions allowed the jury to acquit Petitioner of the burglary charge even in the absence of a specific mistake in fact instruction. The court instructed the jury that the charged crimes required a "union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists, the crime to which it relates is not committed." RT 674. In its instruction on burglary, the court charged the jury:

> Every person who enters any inhabited dwelling house with the specific intent to steal, take, and carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of that property is guilty of the crime of burglary, in violation of Penal Code section 459. It does not matter whether the intent with which the entry was made was thereafter carried out.
>
> In order to prove this crime, each of the following elements must be proved: One, a person entered an inhabited dwelling house; and two, at the time of the entry, that person had the specific intent to steal and take away someone else's property and intended to deprive the owner permanently of that property.

RT 675.

Thus, existence of the required specific intent was inconsistent with a mistake of fact. Had the jury believed that Petitioner was operating under a mistake of fact and that he entered the house with the sole intent to take a Coke permissively, it would, in light of the instructions given, have acquitted him.

Because the instructions as a whole adequately embodied the defense theory, the state court's rejection of Petitioner's claim of instructional error was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Accordingly, this claim for relief is DENIED.

## III.     Sufficiency of the Evidence

### A.     Background

Petitioner claims that the evidence was insufficient to support the conviction for concealing stolen property based upon his possession of a house key belonging to Phebus. The prosecution's theory was that Phebus gave the key to Cox, Cox lost it in the yard, and Petitioner found it and kept it to use later in entering Phebus's house to commit the first burglary. Phebus testified at trial that Petitioner told her he had used a key he found in the yard to enter her house and get a Coke. The jury found Petitioner guilty of a violation of California Penal Code section 496, which states in pertinent part that every person "who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished." Cal. Pen. Code § 496(a). On appeal Petitioner argued that

15

the elements for concealing stolen property had not been met because the evidence was insufficient to support the conclusion that the key was stolen and that he concealed it, because he simply had found it in the yard and put it into his jacket pocket.

The California Court of Appeal rejected Petitioner's claim as follows:

> There was substantial evidence that Rogge knew the key was stolen because there was substantial evidence that Rogge stole the key. A thief can be convicted of violating section 496. (*People v. Allen* (1999) 21 Cal.4th 846, 861.) Rogge concedes "Bill Cox lost the key provided to him by Phebus and that a similar key was eventually found in Rogge's jacket pocket." He agrees the evidence shows that "at the preliminary hearing [Phebus] testified that Rogge told her he had come into the house to get a [C]oke and that he used a key he found in the backyard." In finding and taking the key in the yard, Rogge stole the key, and having stolen the key, he concealed and withheld it by putting it in his pocket so that it would be available for use in the burglary.
>
> Rogge argues that "where the wrongful retention of property makes the property 'stolen,' the record must demonstrate some other wrongful detention before the retainer is further guilty of 'concealing' that which had been wrongfully retained in the first place. The subsequent acts of concealment must be so 'completely divorced' from the original misappropriation as to 'constitute an independent course of conduct.' (*People v. Moses* [(1990)] 217 Cal.App.3d [1245] at 1256.)" We disagree with Rogge's argument that "there is no evidence other than pure speculation that Rogge knew whose property the key was when he came into possession of it, or at what point in time he might have become aware that it was lost property and committed theft by misappropriating it." Certainly, using the key to gain entry to Phebus's house is an independent course of conduct beyond the original misappropriation, and indicates knowledge that it was in fact Phebus's key. Substantial evidence supports Rogge's conviction for violating Penal Code section 496.

Opinion at 12.

### B   Applicable Federal Law

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324. A federal court reviewing collaterally a state court conviction does not

determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *See id.* (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume -- even if it does not affirmatively appear on the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.*; *see also People of the Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim). The prosecution need not affirmatively rule out every hypothesis except that of guilt. *Wright v. West*, 505 U.S. 277, 296-97 (1992). The existence of some small doubt based on an unsupported yet unrebutted hypothesis of innocence therefore is not sufficient to invalidate an otherwise legitimate conviction. *See Taylor v. Stainer*, 31 F.3d 907, 910 (9th Cir. 1994). Moreover, circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.* 1275 (quoting 28 U.S.C. § 2254(d)).

17

C.     Analysis

A state court's interpretation of state law binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 126 S. Ct. 602, 604 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). The state's highest court is the final authority on the law of that state. *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).

Under the holding of *People v. Allen*, 21 Cal. 4th 846 (1999), relied upon by the California Court of Appeal in its analysis, a defendant who is a thief can be convicted of concealing or withholding stolen property. California Penal Code section 485 provides:

> One who finds lost property under circumstances which give him knowledge of or means of inquiry as to the true owner, and who appropriates such property to his own use, or to the use of another person not entitled thereto, without first making reasonable and just efforts to find the owner and to restore the property to him, is guilty of theft.

Thus, under California law, one whose actions fall within the purview of section 485 can be convicted under section 496(a), as Petitioner was.

The Court of Appeal found that substantial evidence supported the finding that Petitioner stole the key and that he was guilty of concealing or withholding stolen property under section 496(a). This conclusion was not based on an unreasonable determination of the facts in light of the evidence presented at trial, nor was it contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Accordingly, this claim for relief is DENIED.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: May 15, 2006

_____
JEFFREY S. WHITE
United States District Judge

18